Hillsborough, ⟩
April 6, 1937. ⟨

CATHERINE SHEA *v.* BOSTON & MAINE RAILROAD.

*Foster & Lake* and *Gordon S. Lord* (*Mr. Lord* orally), for the plaintiff.

*Warren, Wilson, McLaughlin & Wiggin* (*Mr. Wiggin* orally), for the defendant.

ALLEN, C. J.   The plaintiff was traveling westerly on the highway until within a few rods of the underpass.   The highway then curved to the left until it reached the underpass through which the roadway ran in a southerly course.   The railroad bridge over the underpass was supported by masonry walls.   The highway was laid out twenty feet wide at the underpass, and the railroad location had a width of three rods.   The faces of the abutment walls were on the highway sidelines for a part of their lengths.   But they were so located that the twenty foot distance between them extended for no more than a rod.   The roadway where the walls were thus opposite each other occupied all the highway width.

The accident occurred after dark and it was snowing heavily.   The driver of the automobile was unfamiliar with the highway, and did not seasonably or sufficiently turn the car to the left on the curve approaching the underpass.   When he saw the westerly abutment on his right side he was close upon it.   He then turned sharply to the left and applied his brakes.   The car slued, its rear right wheel struck against the abutment wall at its northerly end, and it then swung lengthwise against the face of the wall.

Along the side of the highway before it reached the underpass certain warning signs had been erected, and the end of the westerly abutment wall was painted with black and white stripes.   The signs had been placed by the state as an incident of highway maintenance and safety.   The jury were instructed that the defendant had no duty or right to place signs along the highway and none to control the approaches to the underpass.   This instruction was accepted and thus became the law of the trial.

The highway was built in 1896 and its layout the preceding year provided for the underpass, to avoid a grade crossing over the track of the railroad already constructed and in operation.   The highway later became a part of the state maintained trunk route designated as the Dartmouth College Road.   Sometime after the accident the highway was relocated at the crossing and an overpass was built to take the place of the underpass.

The plaintiff claims that the accident was caused by the railroad's

neglect to provide a suitable crossing. The original construction and location of the abutment walls is conceded to have been proper, but it is asserted that in the course of time and prior to the accident the underpass became unsuitable for the travel through it, by reason of the increase and change of character of travel brought about by the use of motor vehicles, and that the defendant owed the duty to remedy the situation.

The common-law duty of the railroad was that of an adjoining landowner. No encroachment in any way upon the highway is alleged. Nor was there any threatened interference with the use of the highway. The abutment walls were structurally sound. Their place of maintenance is the only reason for any claim that they constituted an unreasonable use by the railroad of its property. Their state of maintenance was proper, there being no danger therein.

Under these facts no violation of a common-law duty may be found. So long as an owner is not disturbed in the use and enjoyment of his property, he may not complain of a static and safe condition of adjoining property and require changes in it to make the use of his own property more convenient and safe. The doctrine of reasonable use does not illegalize inaction and passive conduct when the duty of maintenance in restraint of interference and encroachment is not in question and when the danger arises from a change in the use of the adjoining property. One whose conduct creates hazards in the use of his property is not injured by his neighbor's omission of action which will obviate them, so long as nothing enters and comes upon his property from that of his neighbor. No obligation exists at common law for one to maintain his property for the benefit of others. The obligation is to act reasonably to avoid injury to them. "... it may be stated as a general doctrine that, in order to constitute a nuisance from the use of one's property, the use must be such as to produce a tangible and appreciable injury to neighboring property, or such as to render its enjoyment specially uncomfortable and inconvenient." *Lane* v. *Concord*, 70 N. H. 485, 489. And here nothing has been done by the railroad to transform an admittedly reasonable use into an unreasonable one. A duty to change inert physical conditions to meet changes in the use of neighboring property would impose an undue burden upon ownership.

The principle that "One who creates or maintains a situation which involves an unreasonable risk of injury to others because of their expectable lawful action is properly regarded as negligent" (*Duteny* v. *Company*, 84 N. H. 65, 67) is not disregarded. It does not place

a burden on a landowner to adapt his premises to changes of condition or use of adjacent premises when without the changes no danger exists and when no disturbance of their use is menaced. The danger is then due, not to the landowner's maintenance, but to the changed condition or use of the adjoining property. Safety of maintenance and changes in use may be reasonable requirements, but a proper location of a structure remains such. The railroad owed no duty to relocate the abutment walls merely because the public made an increased and new use of the highway.

The railroad's statutory duty stands differently. The general duty "to provide suitable crossings" (P. L., c. 249, s. 1) applies to crossings where the grades are separated as well as to those at grade. *Concord* v. *Railroad*, 69 N. H. 87; *Laconia* v. *Railroad*, 81 N. H. 408, 411; *Pierce* v. *Railroad*, 83 N. H. 466. The inquiry is presented whether the railroad had any duty to make the crossing safer or to take action for its relocation.

As to greater safety of the crossing, the crossing was the area occupied by both the highway and railroad locations. The twenty foot highway width was to be suitably maintained by the railroad. But no conditions brought about by the railroad made it unsuitable. No change in operation of the railroad or increase of railroad use took place to affect the safety of highway travel, and the railroad had nothing to do with the approaches to the crossing. These approaches of curving roadway and topography concealing the view of the underpass until it was near at hand constituted the conditions of danger. It was primarily not the underpass itself which was unsafe. The difficulties and hazards inhered in the physical situation while coming to it.

The abutment walls were a part of the railroad bridge, but they were no part of the crossing. They were outside the highway layout, and it was the crossing area to which the railroad's duty was directly confined. It had no right to change the highway location, and it was under no duty to dedicate or appropriate its right of way on either side of the crossing to highway uses, except to maintain its structures in such manner that they would not interfere with or obstruct highway travel. It might, if it could, "make the bridge without in any way interfering with the town roadway" (*Worcester &c. R. R.* v. *Nashua*, 63 N. H. 593, 596), and this it did. It was under no obligation to provide a greater width of roadway than that within the crossing. If the highway width became too narrow, by reason of different and increased highway travel, it was not incumbent upon the rail-

road to provide additional highway facilities for the crossing. The railroad's requirement to seek a relocation of the crossing is a distinct issue, to be later considered.

While the railroad's duty to furnish a suitable crossing implies the incidental duty to maintain its premises on both of the highway sidelines in such manner as will not produce an unsafe condition of the crossing, the duty is not absolute. The statute does not hold the railroad liable for any and all danger, but only demands that it "exercise reasonable care to keep the . . . [crossing] 'in a reasonably safe and convenient condition for public use'." *Pierce* v. *Railroad*, 83 N. H. 466, 467.

It is suggested that the abutment walls were in faulty alinement. If they were, it was because the highway alinement became faulty. But if it might be found that a time came when highway travel conditions were such that the walls made the crossing unsuitable because for a part of their lengths they were maintained opposite each other on the highway sidelines, the reasonableness of a requirement to rebuild them farther apart from each other seems doubtful. If the undertaking had been carried out, the curving approaches and blind view would have persisted to the extent of some demand for a relocation of the crossing.

The doubt does not need to be resolved, however, for the evidence does not permit a finding that the accident was due to an improper maintenance of the walls. They were erected outside the highway location, and it does not appear that their incidental feature as barriers to prevent travelers from driving off the highway upon the railroad's adjacent land was more than an occasion of the accident. The railroad had the right to erect reasonable barriers, such as a fence or a curbing, to confine travel to the highway, and it is impossible reasonably to infer that if the car had struck against such a barrier, it would not have slued as it did and the plaintiff have been hurt as she was. The car struck the face of the westerly wall at its northerly end and where, as shown by the plaintiff's plan, the wall was about five feet back from the sideline of the highway. Since it may not be found that if there had been a proper barrier, the accident would have been avoided, any improper attribute of the wall as a barrier had no causative bearing to produce the accident. No other charge of omission of duty in securing the safety of the underpass is made.

The railroad's duty to take action for a relocation of the crossing is not well defined by statutory enactment. The general statute for providing suitable crossings has reference to those where the high-

way location at a crossing has been established. It gives the railroad no power to relocate the highway or to separate the grades at a crossing. Hence, it imposes no duty therefor, and the duty to undertake to obtain a change in location to improve a crossing, if it exists, must be found in other legislation. In respect to such legislation, it is to be noted at the outset that to establish liability for a breach of the duty it must appear that the undertaking to secure a change would have met with success. But the evidence here authorizes a finding that the change if sought would have been permitted or ordered.

Two statutes, one succeeding the other, have provided for procedure by which changes to avoid or improve a crossing may be authorized or directed. One (P. L., c. 249, s. 8) empowered the Public Service Commission to grant a railroad's petition for authority to change a highway location for such avoidance or improvement of a crossing. This statute was in force from a time antedating the construction of the underpass in 1896 to 1927, when it was repealed by the successor statute (Laws 1927, c. 103). By this repealing act the Public Service Commission upon petition of a railroad, local selectmen, or the State Highway Commissioner may order a change in a crossing location. The town or state makes the change and the expense is apportioned between the public and the railroad as the commission determines.

A duty to apply to the commission when changes are needed by reason of the railroad's own operations seems clear. But when they are demanded because of increase in the amount of highway travel over the crossing or of a difference in the character of the travel, the legislative purpose that such reasons for the changes should be sufficient to require the railroad to institute proceedings for them is not deemed to be implicit. The public is fairly the judge of its needs which it has created and brought about, and no statutory intent is evinced of requirement for the railroad to take initiative action for a relocation on account of new conditions thus existing. The public not acting when it has made changes in the travel over the crossing, it is not reasonable to require the railroad to be the first in moving for action. The inaction of the public cannot be regarded as unreasonable. The statute is not found to order action of the railroad in precedence of that of the public, unless the railroad has made the changes which render the existing crossing unsuitable.

While the repealed statute required proceedings for a change to be brought by the railroad, the right to petition for a highway layout under other statutes (P. L., c. 74, ss. 2, 9), with proceedings thereunder

conformable to the requirements of crossing locations (P. L., c. 249, s. 2), and the authority bestowed upon a town to require crossing changes (P. L., c. 249, s. 9), furnished methods by which the public might commence action seeking changes. Thus prior to 1927 both the public and the railroad might initiate proceedings, and the statute which the 1927 act repealed imposed no duty on the railroad to seek changes different from that placed upon it by that act.

In summarized statement, the legislature recognized that changes in highway use or in railroad operation might require crossing changes. A railroad's duty to provide suitable crossings was to secure safety and convenience for crossings that might be constructed. It had no responsibility for the highway layout, but only the duty to take care of the highway within the crossing area and as it was laid out. The matter of crossing changes was subject to public regulation and control. Either the public or the railroad might seek them. The railroad had no duty to make them unless permitted or ordered. A duty to seek permission was not created by only a change of use of the existing crossing rendering it unsuitable. An inadequate or improper highway width or alinement was not chargeable to the railroad unless its own operations produced the defectiveness. A change in highway use resulting in an unsuitable crossing, the defects of which could be remedied only by changes sanctioned by public authority, was not reason to make the railroad liable for the unsuitableness or to require it to apply for the changes to be undertaken. The right to seek a relocation is not a duty unless the railroad has made the relocation necessary.

*Judgment for the defendant.*

All concurred.